# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*") is made effective as of November 30, 2017 (the "*Effective Date*") between and among REVELATION ENERGY, LLC, a Kentucky limited liability company ("*Revelation*"), BLACKJEWEL L.L.C., a Delaware limited liability company ("*Blackjewel*" and, together with Revelation, whether individually or collectively, "*Seller*"), and LEXINGTON COAL COMPANY, LLC, a Delaware limited liability company ("*Buyer*"). Seller and Buyer are sometimes referred to collectively herein as the "*Parties*" and individually as a "*Party*."

WHEREAS, this Agreement contemplates a transaction in which Seller will sell certain assets and pay certain amounts to Buyer and Buyer will assume certain liabilities from Seller upon closing of the transactions contemplated herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

1.1    Definitions.    Unless otherwise provided to the contrary in this Agreement, capitalized terms in this Agreement shall have the following meanings:

"*Adverse Consequences*" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, Taxes, liens, losses, expenses, and fees, including court costs and attorneys' fees and expenses.

"*Encumbrance*" means any mortgage, pledge, lien, encumbrance or security interest on any of the Purchased Assets.

"*Governmental Authority*" means the United States and any state, county, city or other political subdivision, agency, court or instrumentality.

"*Insurance Policies*" means all material policies of insurance of Seller.

"*Law*" or "*Laws*" means any statute, code, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any applicable Governmental Authority.

"*Obligations*" means duties, liabilities and obligations, whether vested, absolute or contingent, known or unknown, asserted or unasserted, accrued or unaccrued, liquidated or unliquidated, due or to become due, and whether contractual, statutory or otherwise.

"*Permitted Encumbrances*" means, with respect to the Purchased Assets, any of the following: (i) any liens for Taxes and assessments not yet due and payable or, if due and payable,

that are being contested in good faith in the ordinary course of business; (ii) liens reserved for Seller's performance under leases, subleases, licenses and similar instruments; (iii) any Encumbrances listed on Schedule 1.1 which is attached hereto and made a part hereof; (iv) easements, rights-of-way, restrictions and other similar encumbrances; and (v) any mortgage, deed of trust, pledge, lien or security interest which may be a matter of record.

"*Person*" means an individual or entity, including, without limitation, any corporation, association, joint stock company, trust, joint venture, limited liability company, unincorporated organization, or governmental entity (or any department, agency or political subdivision thereof).

"*Tax*" or "*Taxes*" means any Federal, state or local income, sales, use, ad valorem, real property or personal property tax, including Transfer Taxes, and interest, penalties or additions thereto, whether disputed or not.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"*Transaction Documents*" means this Agreement and all other agreements, instruments and documents required to be delivered at the Closing.

1.2    Interpretations.  Unless expressly provided for elsewhere in this Agreement, this Agreement shall be interpreted in accordance with the following provisions:

(a)    Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

(b)    If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(c)    A reference to a person, corporation, trust, estate, partnership, or other entity includes any of them.

(d)    The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(e)    All references in this Agreement to articles, sections or subdivisions thereof shall refer to the corresponding article, section or subdivision thereof of this Agreement unless specific reference is made to such articles, sections, or subdivisions of another document or instrument.

(f)    A reference to any agreement or document (including, without limitation, a reference to this Agreement) is to the agreement or document as amended, varied, supplemented, novated or replaced, except to the extent prohibited by this Agreement or that other agreement or document.

2

(g)      No waiver by either Party of any default by the other Party in the performance of any provision, condition or requirement herein shall be deemed to be a waiver of, or in any manner release the other Party from, performance of any other provision, condition or requirement herein, nor shall such waiver be deemed to be a waiver of, or in any manner a release of, the other Party from future performance of the same provision, condition or requirement.  Any delay or omission of either Party to exercise any right hereunder shall not impair the exercise of any such right, or any like right, accruing to it thereafter.  The failure of either Party to perform its obligations hereunder shall not release the other Party from the performance of such obligations.

(h)      A reference to any Party to this Agreement or another agreement or document includes the Party's successors and assigns.

(i)      A reference to legislation or to a provision of legislation includes a modification or reenactment of it, a legislative provision substituted for it and a regulation or statutory instrument issued under it.

(j)      A reference to a writing includes a facsimile transmission of it and any means of reproducing of its words in a tangible and permanently visible form.

(k)      The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(l)      The word "including" shall mean including without limitation.

(m)      The Exhibits identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

(n)      The Parties have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1      Purchase and Sale.  Subject to the terms and conditions of this Agreement, Seller agrees to sell and assign to Buyer and Buyer agrees to purchase and assume from Seller all of Seller's rights, title and interests in and to the following (all of which are collectively referred to as the *"Purchased Assets"*), free and clear of all Encumbrances, except Permitted Encumbrances:

(a)     The real property listed on Schedule 2.1(a) attached hereto and made a part hereof (collectively, the "*Owned Real Property*").

(b)     The leases and other real property interests listed on Schedule 2.1(b) attached hereto and made a part hereof (collectively, the "*Leased Real Property*" *or* "*Lease*").

(c)     The permits listed on Schedule 2.1(c) attached hereto and made a part hereof (collectively, the "*Permits*").

(d)     All equipment listed on Schedule 2.1(d) attached hereto and made a part hereof (collectively, the "*Equipment*").

(e)     All agreements listed on Schedule 2.1(e) attached hereto and made a part hereof (collectively, the "*Contracts*").

(f)     All other assets listed on Schedule 2.1(f) and all other assets which are directly related to the assets described in Schedule 2.1 (a)-(f) and which provide a benefit to such accounts attached hereto and made a part hereof (collectively, the "*Other Purchased Assets*").

(g)     All records in the possession of Seller pertaining to the assets described above in subsections (a) through (f), including, without limitation, all maps, files, reserve information and other similar materials pertaining (collectively, the "*Records*").

2.2     Assumed Obligations.   At Closing, Buyer will assume only the following Obligations of Seller (collectively, the "*Assumed Obligations*"):

(a)     All asset retirement liabilities and all other reclamation Obligations relating to the Purchased Assets whether arising before, on or after the Closing Date, but not including any asset retirement liabilities or other reclamation Obligations that are related to the Retained Obligations (as defined below) or any fines, penalties or similar charges arising before the Closing Date.

(b)     All Obligations relating to the Purchased Assets arising from or related to Seller's purported ownership, possession, use or operation of the Purchased Assets after the Closing Date.

(c)     The post-Closing Obligations of Seller under the Purchased Assets that, by their terms, arise after the Closing Date, and are to be observed, paid, performed or discharged, as the case may be, at any time after the Closing Date.

(d)     All Obligations arising under any Environmental Law relating to the Purchased Assets arising at any time after the Closing Date.

2.3     Retained Obligations.   Except for the Assumed Obligations, Buyer shall not assume, and Seller shall remain solely responsible for and shall retain, pay, perform and discharge any and all other Obligations of Seller (collectively, the "*Retained Obligations*").

11803700v1                                    4

2.4     Additional Consideration.  As further consideration for Buyer's assumption of the Assumed Obligations, Blackjewel shall pay Buyer the sum of One Million Eighty-Six Thousand Dollars ($1,086,000.00) in cash at Closing (the "*Cash Payment*").

2.5.     The Closing.  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Dinsmore & Shohl LLP, 611 Third Avenue, Huntington, West Virginia, at 10:00 am, local time, on the date mutually agreed upon by the Parties, or at such other time, date or place as Seller and Buyer may mutually agree upon in writing but in no event later than March 31, 2018. The date on which the Closing is to occur is herein referred to as the "*Closing Date*".

2.6     Deliveries at Closing.

(a)     At Closing, Seller shall:

(i)     Deliver to Buyer the Cash Payment.

(ii)     Execute and deliver to Buyer deeds conveying the Owned Real Property to Buyer in form and substance reasonably acceptable to the Parties.

(iii)     Execute and deliver to Buyer an assignment of the Leases in substantially the form attached as Exhibit A.

(iv)     Execute and deliver to Buyer an assignment of the Permits in substantially the form attached as Exhibit B.

(v)     Execute and deliver to Buyer a bill of sale for the Equipment and Other Purchased Assets in substantially the form attached as Exhibit C.

(vi)     Execute and deliver to Buyer an assignment of the Contracts in substantially the form attached hereto as Exhibit D.

(vii)     Execute and deliver to Buyer the Equipment Lease Agreement in substantially the form attached hereto as Exhibit E.

(viii)     Deliver to Buyer such other documents as Buyer may reasonably request that are necessary for the consummation of this Agreement.

(b)     At Closing, Buyer shall:

(i)     Execute and deliver to Buyer the Transaction Documents.

(ii)     Deliver to Seller such documents as Seller may reasonably request that are necessary for the consummation of this Agreement.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

3.1     Representations as to Seller and the Transaction.  Seller represents and warrants to Buyer as follows:

(a)     Organization of Seller.   Seller is a limited liability company duly organized, validly existing, and in good standing under the Laws of the state of its organization.

(b)     Authorization of Transaction.  Seller has all requisite organizational power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement. This Agreement constitutes the valid and legally binding obligation of Seller enforceable in accordance with its terms and conditions.

(c)     Brokers' Fees.  Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated.

3.2     Representations and Warranties Concerning the Purchased Assets. Seller represents and warrants to Buyer as follows:

(a)     Encumbrances.    The Purchased Assets are free and clear of all Encumbrances, except for Permitted Encumbrances.

(b)     No Adverse Claims.  There are no adverse claims to any of the Purchased Assets except for (i) Permitted Encumbrances and (ii) those claims which would not have a material adverse effect.

(c)     Tax Matters.  Except as would not have a material adverse effect, there are no disputes or claims concerning any Tax liability with respect to the Purchased Assets claimed or raised by any authority.

(d)     Litigation.  Except as may be set forth in Schedule 3.2(d), none of the Purchased Assets (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is the subject of any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction, or is the subject of any pending or threatened claim, demand, or notice of violation or liability from any Person, except where any of the foregoing would not have a material adverse effect.

(e)     Environmental Matters.

(i)     With respect to the Purchased Assets, Seller is in material compliance with all Environmental Laws, except for such instances of noncompliance that do not have a material adverse effect.

(ii)    Seller has obtained all licenses, permits, franchises, authorities, consents, and approvals, and has made all filings and maintained all material information, documentation, and records, as necessary under applicable Laws including Environmental Laws for owning or operating the Purchased Assets and any related business as it is presently conducted, or contemplated to be conducted, and all such permits, licenses, franchises, authorities, consents, approvals, and filings remain in full force and effect, except for such matters that do not have a material adverse effect.

(iii)    Except as set forth on Schedule 3.2(e), (A) there are no pending or threatened claims, demands, actions, administrative proceedings or lawsuits against Seller or it predecessors in title with respect to the Purchased Assets under any Environmental Laws and (B) none of the Purchased Assets are subject to any outstanding injunction, judgment, order, decree or ruling, under any Environmental Laws.

(f)    Title.    Seller has good, marketable and indefeasible title to all the Purchased Assets, free and clear of any Encumbrances of any kind or nature whatsoever, other than for Permitted Encumbrances.

(g)    Real Property.    Seller has good and marketable fee simple title in and to the Real Property, free and clear of all Encumbrances, except for Permitted Encumbrances. Seller has not leased or otherwise granted to any Person the right to use or occupy the Real Property or any portion thereof.  There are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase the Real Property or any portion thereof or interest therein.

(h)    Contracts.    All contracts to be assigned Buyer are freely assignable to Buyer and will be enforceable by Buyer in accordance with their respective terms (individually a "*Contract*" and jointly the "*Contracts*").  There is not under any Contract any existing default by any party thereto or event which, after notice or lapse of time, or both, would constitute such a default or result in the imposition of any late charges, liquidated damages or other penalties except for such defaults that would not have a material adverse effect.  Seller is not aware of any intention by any party to any Contract (i) to terminate or amend the terms thereof, or (ii) to renew the same upon expiration only on terms and conditions which are more onerous and burdensome than those pertaining to the existing Contract.

(i)    Leases.    The Leases are in full force and effect and Seller has performed all Obligations required to be performed by it under the Leases, except when such default would not have a material adverse effect.  Seller is not in default under any Obligation under the Leases, except when such default would not have a material adverse effect.

(j)    Permits.    The Permits are in full force and effect. Seller is not in default under or in violation of the Permits. Except as set forth on Schedule 3.2(j), there are no outstanding penalties, notices of noncompliance, agreements, judgments, consent decrees, agreed orders, or administrative actions or proceedings affecting the Permits.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF BUYER

4.1     Representations as to Buyer and the Transaction.  Buyer hereby represents and warrants to Seller as follows:

(a)     Organization of Buyer.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware.

(b)     Authorization of Transaction.  Buyer has all requisite organizational power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.  This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions.

4.2     No Other Representations Beyond Those Expressed Herein. Buyer makes no other representation to any other Party to this Agreement as to any matter except as otherwise expressly provided herein.

## ARTICLE V
### POST-CLOSING COVENANTS

5.1     General.  If at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefore under Article VI).

5.2     Delivery of Records.  As soon as practicable after the Closing Date, Seller will deliver or cause to be delivered the Records to Buyer at its principal office location or such other mutually agreeable location.  Seller (and its successors and assigns) may retain a copy of the Records to the extent that they relate to the operation of its business.

5.3     Permits.

(a)     The Parties shall use their commercially reasonable efforts to diligently and in good faith pursue the transfer of each Permit to Buyer and the approval of each such transfer by each relevant Governmental Authority.  After the Closing Date, Buyer shall submit and file with the applicable Governmental Authority a complete and correct successor operator permit application and any other application or document necessary to cause or allow the transfer of each Permit to Buyer and the release of any and all of Seller's bonds related thereto.  Simultaneously with the submission of the successor operator permit application, Buyer shall file and post with such Governmental Authority new bonds with adequate surety to allow transfer of each Permit and cause a full and complete release of Seller's bonds upon final transfer of each Permit.  Seller agrees to cooperate fully with Buyer in the preparation and execution of all additional applications and other documents or submittals necessary to accomplish the transfer and assignment of each Permit to Buyer.

(b)     After the Closing Date, Seller shall designate Buyer as "operator" with the appropriate Governmental Authority under each Permit where such designation is necessary for Buyer's operations until all consents to the transfer of the Permit are received.  During this period, Buyer shall comply, in all material respects, with all Laws applicable to the Permit and shall give Buyer prompt written notice of any incidents or occurrences of non-compliance with such Laws, which Buyer shall have the right (but not the obligation) to cure, including any necessary right of entry to the property that is the subject of any of the Purchased Assets.  Buyer agrees to, and does hereby, indemnify and hold Seller harmless in respect of any claim, loss, cost, expense (including without limitation, fees, expenses, disbursements and other charges of attorneys, accountants, consultants, experts and other professionals), liability, fine, penalty, interest, payment and/or damage incurred or suffered by Seller resulting from, arising out of, caused proximately by, incurred or suffered in connection with or incident to any liability or obligation relating to the Permit or Buyer's operations thereunder arising after the Closing Date.

(c)     If a Permit cannot be transferred to Buyer for any reason beyond the control of Buyer, Buyer shall be entitled to continue to utilize the Permit either as a designated operator or under some other mutually satisfactory arrangement.

(d)     Seller agrees that from the Closing Date through the transfer of a Permit to Buyer or so long as Buyer shall continue to utilize the Permit either as a designated operator or under some other mutually satisfactory arrangement, Seller shall not sell, transfer or otherwise dispose of the Permit or any portion thereof.

(e)     Until such time as each bond is released, Buyer shall reimburse Seller for all continuing costs and to keep each such bond in full force and effect.

5.4     <u>Contract Mining Agreement</u>.  If any sublease, assignment or transfer of a Contract or Lease would operate to void or nullify any such Contract or Lease, the Parties shall enter into a contract mining agreement or other agreement so as not to terminate the Contract or Lease under usual and customary terms for the Parties and with financial terms no less burdensome to the Parties than those provided herein.

### ARTICLE VI
### REMEDIES FOR BREACHES OF AGREEMENT

6.1     <u>Survival of Representations, Warranties and Certain Covenants</u>.  The representations and warranties of Seller contained in <u>Section 3.1</u> shall survive the Closing under this Agreement indefinitely and those contained in <u>Section 3.2</u> for a period of three (3) years after the Closing Date, except those for which Seller has applicable insurance coverage and for those relating to Taxes, both of which shall survive for the maximum applicable statute of limitations.  The representations and warranties of Buyer contained in <u>Article IV</u> shall survive the Closing indefinitely.  The covenants contained in this Agreement to be performed after the Closing shall survive the Closing indefinitely.

6.2    Indemnification Provisions for Benefit of Buyer.

(a)    Seller shall indemnify and hold Buyer harmless from and against any and all Adverse Consequences whatsoever arising out of or resulting from:

(i)    Any breach of warranty or misrepresentation by Seller or the nonperformance of any covenant or obligation to be performed by Seller to the extent that and only to the extent that (A) there is an applicable survival period pursuant to this Article; and that (B) Buyer makes a written claim for indemnification against Seller pursuant to Article VI within such survival period;

(ii)    Any liability or claim arising out of the ownership, conduct or operation of the Purchased Assets prior to the Closing Date;

(iii)    Any claim which may be asserted against Buyer or any of the Purchased Assets by any of Seller's employees, independent contractors, their employees, or agents with respect to liabilities incurred by or on Seller's behalf prior to the Closing Date, whether covered by a collective bargaining agreement or not, including labor costs, severance pay, pension benefits, employee benefits, workers' compensation, vacation and holiday benefits, sick pay, multiemployer withdrawal liability, any and all employee benefits, and any other costs associated therewith; and/or

6.3    Indemnification Provisions for Benefit of Seller.

(a)    Buyer shall indemnify and hold Seller harmless from and against all Adverse Consequences whatsoever arising out of or resulting from:

(i)    Any breach of warranty or misrepresentation by Buyer contained herein, or the non-performance of any covenant or obligation to be performed by Buyer.

(b)    Limitations of Indemnification. Seller acknowledges and agrees that the indemnification provisions in this Article shall be the exclusive remedies of Seller, Seller Indemnitees and their affiliates with respect to the transactions contemplated by this Agreement.

6.4    Matters Involving Third Parties.

(a)    If any third party shall notify any Party (the "*Indemnified Party*") with respect to any matter (a "*Third Party Claim*") that may give rise to a right to claim for indemnification against any other Party (the "*Indemnifying Party*") under this Article, then the Indemnified Party shall promptly (and in any event within 5 business days after receiving notice of the Third Party Claim) notify the Indemnifying Party thereof in writing.

(b)    The Indemnifying Party will have the right to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without

the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party.

(c)    Unless and until the Indemnifying Party assumes the defense of the Third Party Claim as provided in subsection 6.4(b), the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

(d)    In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party which consent shall not be withheld unreasonably.

## ARTICLE VII
## TAX MATTERS

7.1    Proration of Taxes. As of the Closing Date, there shall be prorated between Seller and Buyer accrued or prepaid items (other than any prepaid, advance, recoupable royalty or payment balances) relating to the Purchased Assets that relate to the period beginning before the Closing Date and ending after the Closing Date such that (a) Seller shall be liable for (and shall reimburse Buyer to the extent that Buyer shall pay) that portion of such Taxes and other expense items relating to, or arising in respect of, periods through the Closing Date, and (b) Buyer shall be liable for (and shall reimburse Seller to the extent Seller shall have paid) that portion of such Taxes and other expense items related to, or arising in respect of, periods after the Closing Date, including ad valorem and similar taxes with respect to the Purchased Assets. To the extent the amounts of any such proratable items are not finally known at the Closing, appropriate settlement will be made within thirty (30) days after the amount of any such item is finally known.

7.2    Cooperation on Tax Matters. Each Party shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any audit, litigation or other administrative or judicial proceeding relating to liability for Taxes. Each Party shall retain all books and records that are in its possession with respect to Tax matters pertinent to the Purchased Assets relating to any taxable period beginning before the Closing Date until the expiration of the applicable statute of limitations.

7.3    Transfer Taxes. Seller and Buyer shall cooperate in the preparation, execution, and filing of all returns, questionnaires, applications or other documents regarding any transfer, recording, documentary, sales, use, stamp, registration and other similar taxes and fees ("*Transfer Taxes*") that become payable in connection with the transaction contemplated by this Agreement, and Seller and Buyer shall use their commercially reasonable efforts to obtain any certificate, document or take other action to reduce or eliminate any such Transfer Tax. Buyer will file all necessary tax returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, Seller will join in the execution of any such tax returns and other documentation. Notwithstanding anything set forth in this Agreement to the contrary, Buyer will be obligated to bear and shall pay at Closing, any Transfer Taxes incurred in connection with the transactions contemplated by this Agreement. Buyer agrees to indemnify, defend and hold Seller harmless for all such Transfer Taxes.

## ARTICLE VIII
## MISCELLANEOUS

8.1     No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

8.2     Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party.

8.3     Counterparts.  This Agreement may be executed in one or more counterparts (including by means of facsimile or electronic signature page) and all such counterparts taken together shall constitute one and the same Agreement.

8.4     Notices.  All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given two (2) business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient at the party's last known address.  Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient using any other means (including personal delivery, expedited courier, messenger service, telecopy, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.

8.5     Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic Laws of the State of West Virginia without giving effect to any choice or conflict of law provision or rule (whether of the State of West Virginia or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of West Virginia.

8.6     Entire Agreement.  This Agreement (including the documents referred to in this Agreement) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they have related in any way to the subject matter of this Agreement.  Neither this Agreement nor any amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties.

8.7     Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

8.8    Transaction Expenses.  Each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

8.9    Right of Setoff. Either Party may setoff any amounts to which it may be entitled from the other Party under this Agreement or the Transaction Documents against amounts otherwise payable to the other Party under this Agreement or the Transaction Documents.

8.10    Rule of Construction.  The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement, and the Parties agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

[REMAINDER OF PAGE LEFT BLANK; SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have caused this Asset Purchase Agreement to be executed by their duly authorized representatives effective as of the Effective Date.

REVELATION ENERGY, LLC

By: _____

Its: _____

BLACKJEWEL L.L.C.

By: _____

Its: _____

LEXINGTON COAL COMPANY, LLC

By: _____

Its: _____

## Schedule 1.1

### List of Encumbrances

NONE

Schedule 2.1(a)

Owned Real Property

NONE

Schedule 2.1(b)

Leased Property

[SEE ATTACHED]

## Lease Summary

|  | Execution Date |
|---|---|
| **R235 - Slate Branch** |  |
| Alberta & Elmer Stafford | 12/18/1974 |
| Bonzo Heirs Tract III (C5) | 7/9/1991 |
| Cuzzie Gooslin | 10/23/1998 |
| Cylde & Phyliss Daughtery | 3/2/1994 |
| Doug Gooslin | 10/23/1998 |
| Douglas & Evelyn Gooslin | 3/21/2005 |
| George & Della Griffey | 1/1/2006 |
| Glen & Nellie Blankenship | 8/27/1993 |
| James & Bonnie Yound | 9/12/2005 |
| Joseph McCoy | 2/13/1991 |
| Joseph McCoy, et al. | 11/1/2011 |
| Myrtle Dotson | 9/28/1992 |
| Robert & Mary Isom | 6/15/2004 |
| Terry Fields | 10/17/1997 |
| Virgie Fields | 9/9/2001 |
|  |  |
| **A23 - Big Branch** |  |
| Majestic Colleries | 2/1/2010 |
|  |  |
| Poplar Creek | 2/18/2014 |
|  |  |
| **A30 - Point Rock** |  |
| Empire Coal Holdings, LLC | 8/22/2013 |
|  |  |
| **R234 - Gooseneck** |  |
| Arthur & Bunia Ratliff | 9/22/2003 |
| Bonzo Heirs Tract V (C6) | 7/9/1991 |
| Bonzo Heirs Tract IV (C4) | 7/9/1991 |
| Clyde Daughtery | 3/2/1994 |
| Eddie & Mary Dotson | 8/8/2001 |
| Eloise Thacker Alley | 8/25/1981 |
| Ernst Calhoun | 11/10/1997 |
| Hubert Compton | 6/1/1993 |
| Jessica & Thomas Curry | 9/4/2003 |
| JS Cline | 2/5/1981 |
| JW Kinzer (Kinzer Business Realty) (Harold Norma | 12/31/1974 |
| Kermit Ratliff | 9/22/2003 |
| Nora Gooslin Heirs | 7/2/1999 |
| Roy & Janice Browning | 9/1/1980 |
| Teddy Gooslin | 5/2/2006 |
| WE Deaton Heirs | 5/7/1999 |

## Lease Summary

| | Execution Date |
|---|---|
| **P2 - Pontiki Prep Plant** | |
| Hardin Heirs | 5/20/1975 |
| Oliver & Marcheta Blackburn | 9/2/1985 |
| Larry & Barbara Mullins | 4/11/2011 |
| Pocahontas/Pontiki Coal | 9/30/2009 |
| Ruth McCoy | 4/5/1979 |
| Mary Haney et al | 6/28/2011 |
| Mary Haney et al | 4/15/2008 |
| Clyde Scalf et al | 9/27/1988 |
| Earnest & Pearl Cline | 8/13/1973 |
| Ollie & Raymond Gibson (c/o Ramona Williamsor | 5/14/1976 |
| Denzil Lowe | 1/17/2012 |
| Denzil Lowe | 12/1/1993 |
| Norfolk Southern | 2/17/1987 |
| Norfolk Southern | |
| | |
| **S1-Hunt's Branch** | |
| Paul & Helen Norman | 2/27/2004 |
| WS Charles | 4/5/1996 |
| Sandra Bentley | 5/1/1999 |
| Larry & Angela Mounts | 8/10/2004 |
| Donald & Beulah Norman | 6/28/2004 |
| George Norman | 6/28/2004 |
| Arnold & Pearl Schwartz; Keith & William Kilgore | 9/7/2000 |
| Arnold & Pearl Schwartz; Keith & William Kilgore | 9/7/2000 |
| Audy & Sharon Asbury | 9/17/2004 |
| Eddie & Barbara Hurley | 6/20/2006 |
| Gary & Shirley McClanahan | 6/10/2004 |
| Georgia Chapman | 9/17/2004 |
| Glen & Pauline Stump | 8/19/2004 |
| Homer Thompson | 3/4/2005 |
| James & Ellen Charles | 11/21/1990 |
| Kennie Wolford | 7/25/2008 |
| Larry & Angela Mounts | 8/10/2004 |
| Larry & Brenda Wolford | 8/24/2004 |
| Marrow Mounts Heirs | 5/10/2012 |
| Paul & Helen Norman | 2/27/2004 |
| Ronnie Chapman | August 2012 |
| Roy, Jr. & Jewel Dotson | 3/27/2006 |
| Victoria Hicks (Leesha Mullins) | 2/23/2009 |
| William & Sylvia Coleman | 10/10/2001 |

## Lease Summary

| | Execution Date |
|---|---|
| **S1-Pompey West** | |
| Frank Robinette | 1/1/2014 |
| Hassell Prater | 1/1/2014 |
| Eddie Dean Ferrell | 6/18/2014 |
| Geroge Robinette Heirs, John & Melanie Robinett | 3/19/2014 |
| Lura Robinette Gannon | 3/17/2014 |
| Hulita & Diane Blankenship | 6/22/2015 |
| | |
| **S4 - Netley Branch** | |
| David Akers | 9/2/1998 |
| Ricky & Lana Blankenship | 10/24/2001 |
| Clair & Florence Breeding | 7/24/1997 |
| Lilly Crawley | 4/15/2004 |
| Paul Farley | 9/30/2008 |
| Hall / Whitt | 9/2/1998 |
| Gary Hatfield | 3/15/1999 |
| John Loudermelt | 7/24/1997 |
| Kathy Maynard | 9/22/1998 |
| Pocahontas Development | 6/22/2003 |
| Martha Roberts | 10/1/2008 |
| Patsy Salmons | 4/16/2004 |
| Landon Smith | 9/6/1997 |
| Colonial Energy LLC | 5/1/2010 |
| Raynie Hatfield | 3/26/2008 |
| | |
| **S4A - Calloway North** | |
| GW Dotson Heirs Change | 8/4/2010 |
| JL Dotson Heirs | 10/25/1988 |
| Johnny & Henrietta Dotson | 12/9/1993 |
| Kentucky Berwind-Amende 8/15/11 | 1/1/1992 |
| Peter Creek Development | 3/17/1993 |
| Pocahontas Devlopment | 4/15/2009 |
| Pocahontas Devlopment (Colonial Land) | 4/1/1993 |
| Sarah Dotson | 10/23/1990 |
| | |
| **S9 - Findlay Branch** | |
| Almond & Martha McCoy | 5/24/2010 |
| Larry & Barbara Mullins | 5/23/2008 |
| Martin County Coal Corp | 8/12/2008 |

## Lease Summary

|  | Execution Date |
|---|---|
| Jackie & Laura Scott | 5/25/2010 |
| Pontiki Coal, LLC | 1/1/2011 |

### S15 - Flag Knob

|  |  |
|---|---|
| Roy Alexander (Land Rental Celia Fish) | 3/26/2009 |
| Cecil & Bethel Setser | 1/17/2011 |
| Dorothy Maynard | 6/14/2011 |
| Douglas & Rosalee Taylor | 1/16/1995 |
| The Elk Horn Coal Company | 12/1/2009 |
| Goldie & Wanda Taylor | 1/16/1995 |
| Harry & Roberta Jones | 10/24/2008 |
| Pauline Nichols | 3/1/2000 |
| Roy Alexander | 3/26/2009 |

### S18 - Seng Branch

|  |  |
|---|---|
| James & Addie Farley | 6/4/2009 |
| James & Addie Farley, Virginia Karen & Terry Keat | 5/21/2009 |
| Randy Sluss et al | 3/19/2009 |
| John & Lutie Williams | 4/8/2009 |
| Sarah & Harold Hall | 7/28/2009 |
| Shelby Jarrell | 10/20/2009 |
| James & Dorothy Wooley | 11/2/2011 |
| Ronald Maynard et al | 3/24/2010 |
| Calvary Episcopal Church | 5/19/2010 |
| Kings Daughters & Sons | 6/15/2010 |
| Susan & Dane Moore | 11/19/2010 |
| William Kazee | 11/16/2010 |
| Franklin & Betty Booth | 3/11/2011 |
| Marcie & Earnest Hale | 3/29/2011 |
| Norman Vogeler | 8/26/2011 |
| Ronald & Judith Maynard | 8/26/2011 |
| John & Lutie Williams | 8/26/2011 |
| James Harmon | 9/27/2011 |
| Rodney & Grace Jordan | 11/1/2011 |
| Lowell Jordan | 11/1/2011 |
| Connel & Ruby Ware | 12/16/2011 |
| Pack, Reed, Potter, Stepp, Webb & Barrett | 12/17/1998 |
| Lummie & Dorothy Wilson (Larry Whitt-POA) | 2/27/2001 |
| Burgett, Cox, Booth, Vanoy, Foster & Palmer | 3/1/2001 |
| Carl & Nancy Justice | 2/5/2011 |

## Lease Summary

| | Execution Date |
|---|---|
| Lauren Land Company-Override | 12/13/2013 |
| Norfolk & Western Railway Company | 5/7/1982 |
| Russell Stanley | 1/4/1982 |
| Jim & Sadie Jude | 4/18/1983 |
| Andrew & Jean Webb | 1/19/1984 |
| Armel Staton | 11/4/1996 |
| Helen Bush | 11/4/1996 |
| Ray & Linda Jude and Thomas & Elizabeth Muncy | 1/1/2002 |
| Lauren Land Company | 12/13/2013 |
| Pocahontas Development Corporation | 12/11/2013 |
| Triple H Real Estate, LLC-Override | 12/13/2013 |

### S20 - Bevins Branch

| | |
|---|---|
| CAM Mining | 5/21/2015 |
| Alma Land | 12/9/2004 |
| Beaually Land | 12/9/2004 |
| Chestern & Judith Blackburn et al. (French Blackb | 6/12/2013 |
| E.J. (Elbert) & Justine Blackburn et al | 8/5/2007 |
| John Burchett | 12/21/2007 |
| Woodrow & Lora Burchett | 11/11/2005 |
| Ruth & Chester Butcher et al (Tom Fraley Heirs) | 4/21/2007 |
| Bill, Frank & Linda Caldwell | 8/14/2006 |
| Nella Clay | 12/10/2012 |
| DFM, Inc. | 4/12/2004 |
| The Elk Horn Coal Co. | 9/1/2005 |
| Delcie Endicott | 4/22/2009 |
| Barbara Fraely et al (Milford Fraley Heirs) | 6/25/2007 |
| Charles & Nancy Fraley et al (Haskey Fraley Heirs) | 4/25/2007 |
| John & Barbara Fraley et al (Milford Fraley Heirs) | 9/6/2007 |
| Maybeth Fraley et al (Jerry Fraley Heirs) | 4/30/2007 |
| Kalman Franko et al (Maude Gladys Franko Fraley | 5/15/2007 |
| Anna Jean & Ernest Goble et al | 4/11/2007 |
| Connie Hand et al (Samuel Henderson Fraley Heir | 4/22/2007 |
| Billy & Lucille James | 5/6/2008 |
| Helen Spears (Willie C. Thompson as successor) | 1/16/2009 |
| Wanda & Ballard Tussey | 3/25/2008 |
| Emogene Ward et al | 12/11/2006 |
| Sheila & Carl Wenger et al (Dorothy Mae Fraley C | 6/25/2007 |
| DFM, Inc. - Subleases: | |
|    M&M Enterprise | 9/1/1998 |
|    Cero Blackburn et al | 6/4/1996 |
|    Cliff Blackurn et al | 12/30/1999 |

## Lease Summary

|  | Execution Date |
|---|---|
| Denzil Allen et al | 7/26/1999 |
| Denzil Allen | 9/1/2005 |
| Denzil Allen/Jack Hall | 8/23/1999 |
| **T2 - Sunny Ridge Loadout** | |
| Pinson Lease - Robert Pinson | 3/1/1972 |
| NS Agreement 260032 | 4/14/1998 |
| NS Agreement 260009 | 7/11/1995 |
| **Johns Creek & Peter Creek** | |
| Berkeley Energy Corporation | 10/8/2014 |

Schedule 2.1(c)

Permits

[SEE ATTACHED]

REVELATION TO LCC PERMITS

| Job No. # | Job Name | New PERMIT # | Previous PERMIT # | County | Nearest Community | Latitude | Longitude | Total Bond Amount | KRGF Amount | Surety Amount | Supplemental Abatance | LTF Bonds | Disturbed Acres | Slipped | Previous Open Well | Open Well | Reclaimed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Major Reclamation Permits - Will be Mined to Reclaim** | | | | | | | | | | | | | | | | | | |
| 51 | Hunt's Branch | 898-6850 | 898-6837 | Pike | Freeburn | 37-33-14 | 82-09-21 | $7,612,000 | $6,628,000 | $786,000 | $1,200,000 | | 1229.10 | 556.08 | 3500.00 | 936.00 | 862.49 | Mine to Reclaim |
| 51 | Pompey West | 898-6905 | | Pike | Phelps | 37-30-27 | 82-06-59 | $2,125,400 | $971,700 | $1,153,700 | $460,000 | | 275.00 | 0.00 | 7880.00 | 3173.00 | 68.00 | Mine to Reclaim |
| 54A | Calloway North | 898-6802 | 898-6695 | Pike | Phelps | 37-30-11 | 82-10-34 | $3,995,000 | $3,576,500 | $418,500 | $3,156,000 | | 406.11 | 100.48 | 8150.00 | 10760.00 | 180.20 | Mine to Reclaim |
| 51B | White Oak | 898-0254 | 898-0195 | Martin | Pigeon Roost | 37-45-43 | 82-26-19 | $1,246,600 | 50 | $1,246,600 | $150,000 | | 315.00 | 4.49 | 5750.00 | 3436.96 | 258.00 | Mine to Reclaim |
| 52D | 52D Review Branch | 898-6985 | 898-6778 | Pike | McCombs | 37-39-58 | 82-35-48 | $3,979,900 | 50 | $3,979,900 | $3,200,000 | | 1050.00 | 0.00 | 5950.00 | 5950.00 | 550.00 | Mine to Reclaim |
| 52D | 52D Review Branch | 898-0442 | 838-0355 | Floyd | Endicott | 37-39-22 | 82-37-28 | $3,608,300 | 50 | $3,609,300 | $400,000 | | 200.00 | 0.00 | 0.00 | 0.00 | 20.00 | Mine to Reclaim |
| **Major Reclamation with No Mining** | | | | | | | | | | | | | | | | | | |
| 550 | Pompey | 898-0936 | 898-07555 | Pike | Stopover | 37-29-16 | 82-07-57 | $2,677,900 | $2,372,300 | $305,600 | $405,000 | | 330.00 | 265.93 | 1520.00 | 0.00 | 95.00 | Grading/Seeding - Approximately 150 acres |
| **Facilities** | | | | | | | | | | | | | | | | | | |
| P2 | Pontiki Prep Plant | 800-0021 | 800-0006 | Martin | Wolf Creek | 37-43-55 | 82-31-01 | $629,300 | 50 | $629,300 | 50 | | 16.00 | 0.00 | 0.00 | 0.00 | 1.00 | Loadout Facility |
| P1 | Pontiki Refuse | 800-0022 | 800 0050 | Martin | Wolf Creek | 37-43-55 | 82-31-01 | $1,639,700 | 50 | $1,639,700 | 50 | | 100.00 | 0.00 | 0.00 | 0.00 | 30.00 | Loadout Facility |
| T2 | Phelp's Loadout | 898-8160 | 898-8112 | Pike | Calloway | 37-29-32 | 82-11-06 | $423,500 | 50 | $423,500 | 50 | | 45.20 | 0.00 | 0.00 | 0.00 | 0.00 | Plant/Loadout |
| **Deep Mine Permits with Reserves (D2)** | | | | | | | | | | | | | | | | | | |
| R233 | Dougherty Jr | 898-0890 | 898 9604 | Pike | Freeburn | 37-34-12 | 82-09-29 | $170,649 | 50 | $170,649 | 50 | $127,500 | 135.35 | 0.00 | 0.00 | 450.00 | 116.83 | Deep Mine w/ Substantial Reserves Remaing |
| A25 | Callaway South | 898-4408 | 898-4213 | Pike | Phelps | 37-29-11 | 82-12-36 | $186,200 | $160,700 | $25,500 | 50 | | 42.00 | 0.00 | 0.00 | 1766.00 | 41.00 | Deep Mine w/ Substantial Reserves Remaing |
| R96 | Cedar Grove Deep | 898-4479 | 898-4043 | Pike | Argo | 37-27-54 | 82-06-32 | $75,800 | 50 | $75,800 | 50 | | 3.00 | 0.00 | 0.00 | 600.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaing |
| R87 | Widows Grove Deep | 898-4441 | 898-5265 | Pike | Jamboree | 37-30-09 | 82-07-02 | $375,000 | $36,000 | $338,600 | 50 | | 4.13 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaing |
| R86 | Majestic Deep | 898-4480 | 898-5840 | Pike | Jamboree | 37-30-09 | 82-07-02 | $375,000 | 50 | $375,000 | 50 | | 3.48 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaing |
| R89 | Berkley Deep | 898-4513 | 898-4515 | Pike | Kimper | 37-27-28 | 82-23-25 | $55,600 | 50 | $55,600 | 50 | | 0.67 | 0.00 | 0.00 | 300.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaing |
| R77 | Excel Mine #1 | 800-5194 | 800-5156 | Martin | Pilgrim | 37-43-57 | 82-31-01 | $564,000 | 50 | $564,000 | 50 | | 52.00 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaing |
| R78 | Vardour Mine | 800-5195 | 800-5172 | Martin | Moore | 37-43-15 | 82-30-28 | $10,000 | 50 | $10,000 | 50 | | 0.00 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaing |
| R79 | Excel Mine #2A | 800-5051 | 800-0563 | Martin | Moore | 37-38-43 | 82-28-01 | $82,000 | 50 | $82,000 | 50 | | 12.00 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaing |
| R80 | Excel Mine #1A | 800-4492 | 800-4567 | Pike | Galvaar | 37-40-30 | 82-32-29 | $97,000 | 50 | $97,000 | 50 | | 15.80 | 0.00 | 0.00 | 400.00 | 0.00 | Deep Mine w/ Substantial Reserves Remaing |
| **Haul Road Permits** | | | | | | | | | | | | | | | | | | |
| A23 | Pt. Rock / Prevailing Mill Haul Road | 898-7095 | 898-7004 | Pike | Phelps | 37-34-21 | 82-09-44 | $332,500 | $306,000 | $26,500 | 50 | | 52.37 | 0.00 | 0.00 | 0.00 | 0.00 | Haul Road |
| 54 | Pt. Rock Haul Road | 898-7096 | | Pike | Phelps | 37-31-55 | 82-09-43 | $94,000 | $77,000 | $17,000 | 50 | | 19.00 | 0.00 | 0.00 | 0.00 | 0.00 | Haul Road |
| 51D | Pompey Haul Road | 898-7104 | 898-7005 | Pike | Stopover | 37-29-18 | 82-08-00 | $174,900 | $135,300 | $39,600 | 50 | | 62.00 | 0.00 | 0.00 | 0.00 | 0.00 | Haul Road |
| 52D | Pompey Haul Road | 898-7103 | 898-7057 | Martin | Stopover | 37-30-16 | 82-07-01 | $120,500 | $64,500 | $56,000 | 50 | | 22.00 | 0.00 | 0.00 | 0.00 | 0.00 | Haul Road |
| 540 | Southside Road | 898-7058 | 440-7031 | Martin | Inez | 37-44-12 | 82-31-33 | $352,000 | $46,500 | $305,500 | 50 | | 50.00 | 0.00 | 0.00 | 0.00 | 2.00 | Haul Road |
| 52D | Pigeon Roost Haul Road | 898-7057 | 898-7010 | Martin | Pilgrim | 37-45-08 | 82-28-28 | $602,500 | 50 | $602,500 | 50 | | 200.00 | 0.00 | 0.00 | 0.00 | 200.00 | Haul Road |
| 51B | 51 Water Haul Road | 898-7010 | 898-7008 | Martin | Pilgrim | 37-44-17 | 82-34-21 | $583,500 | 50 | $583,500 | 50 | | 108.00 | 0.00 | 0.00 | 0.00 | 108.00 | Haul Road |
| 57D | Dunns Fork Haulroad | 898-7009 | 800-7021 | Martin | Moore | 37-44-10 | 82-28-54 | $381,500 | 50 | $381,500 | 50 | | 120.00 | 0.00 | 0.00 | 0.00 | 120.00 | Haul Road |
| 59 | Finley Br HR | 898-7030 | 800-7033 | Martin | Moore | 37-44-03 | 82-13-36 | $127,500 | $103,000 | $25,500 | 50 | | 34.00 | 0.00 | 0.00 | 0.00 | 34.00 | Haul Road |
| R31 | Scott Br Haul Road | 898-7097 | 898-7100 | Pike | Meta | 37-34-15 | 82-25-33 | $472,500 | $79,600 | $392,900 | 50 | | 91.00 | 0.00 | 0.00 | 0.00 | 2.00 | Haul Road |
| **Maintenance Only** | | | | | | | | | | | | | | | | | | |
| R234 | Greenrock Strip | 898-0891 | 898 0666 | Pike | Freeburn | 37-34-21 | 82-09-44 | $669,800 | 50 | $669,800 | 50 | | 973.62 | 0.00 | 0.00 | 0.00 | 973.62 | phase i |
| R235 | Slate Branch | 898-0893 | 898-0703 | Pike | Ransom | 37-34-09 | 82-11-01 | $1,541,200 | $1,206,600 | $334,600 | 50 | | 125.00 | 0.00 | 0.00 | 0.00 | 100.00 | 1.8mm Tons Reserves Reclaimed |
| 54 | Nattey Br (54-21) | 898-0683 | 898-0700 | Pike | Ransom | 37-32-06 | 82-11-41 | $4,844,000 | $4,455,100 | $389,500 | 50 | | 925.44 | 0.00 | 0.00 | 0.00 | 929.44 | Partial phase i + 3 Fills to be Certified |
| R84 | Pompey East | 898-0935 | 898-9704 | Pike | Stopover | 37-31-32 | 82-05-00 | $105,000 | 50 | $105,000 | 50 | | 77.48 | 0.00 | 0.00 | 0.00 | 77.48 | phase ii |
| 510 | Pompey | 898-0937 | 898-0706 | Pike | Jamboree | 37-29-14 | 82-07-21 | $2,693,200 | 50 | $2,689,200 | 50 | | 300.00 | 0.00 | 0.00 | 0.00 | 250.00 | Ready for Phase i Reserves to be Permitted |
| R85 | Pompey South | 898-0938 | 898-0711 | Pike | Argo | 37-29-17 | 82-08-05 | $1,524,700 | 50 | $1,524,700 | 50 | | 785.00 | 0.00 | 0.00 | 0.00 | 775.00 | Portion Phase i |

REVELATION TO LCC PERMITS

| Job/Rec # | Job Name | New PERMIT # | Previous PERMIT # | County | Nearest Community | Latitude | Longitude | Total Bond Amount | KNDF Amount | Surety Amount | Supplemental Annotations | LTT Bonds | Disturbed Acres | Disturbed | Previous Open Void | Open Void | Reclaimed | Community |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R90 | Eclipse Deep | BS84-0316 | BS84-0316 | Pike | Kinger | 37-30-14 | 82-21-31 | $165,500 | $0 | $165,500 | $0 | | 24.99 | 0.00 | 0.00 | 0.00 | 0.00 | Ready for Phase I - Remove Building? |
| R91 | Berkley Refuse | BB6-0172 | BB6-0172 | Pike | Kinger | 37-29-07 | 82-21-14 | $463,500 | $0 | $463,500 | $0 | $396,000 | 21.00 | 0.00 | 0.00 | 0.00 | 4.00 | Ready for Phase I? |
| R70 | Cow Fork | BB4-0250 | BB4-0194C | Martin | Thomas | 37-41-27 | 83-33-00 | $1,004,100 | $0 | $1,004,100 | $0 | | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | Ready for Phase I |
| R71 | Moisey Branch | BB4-0251 | BB4-0245 | Martin | Moore | 37-44-14 | 83-31-30 | $184,800 | $0 | $184,800 | $0 | | 55.00 | 0.00 | 0.00 | 0.00 | 55.00 | Ready for Phase I |
| R72 | Peter Cave Lake | BB4-0252 | BB4-0187 | Martin | Pilgrim | 37-44-37 | 83-28-32 | $2,814,400 | $0 | $2,814,400 | $0 | | 900.00 | 0.00 | 0.00 | 0.00 | 900.00 | Phase I |
| S18 | Long Branch | BB5-0253 | BB5-0186 | Martin | Pilgrim | 37-44-27 | 83-24-23 | $719,700 | $0 | $719,700 | $300,000 | | 145.40 | 8.40 | 1600.00 | 0.00 | 137.00 | Ready for Phase I+Permit Action |
| S18 | LCC Transfer | BB5-0255 | BB5-0219 | Martin | Pilgrim | 37-44-20 | 82-26-25 | $473,300 | $0 | $473,300 | $0 | | 260.00 | 0.00 | 400.00 | 0.00 | 260.00 | Phase I&Phase II |
| S18 | Meade Branch | BB5-0257 | BB5-0189 | Martin | Pilgrim | 37-44-27 | 82-24-23 | $165,100 | $0 | $165,100 | $0 | | 131.80 | 0.00 | 0.00 | 0.00 | 131.80 | Phase I |
| R155 | Mullins Fork | BB5-0260 | 4BB-0073 | Martin | Pilgrim | | | $102,800 | $0 | $102,800 | $0 | | 50.00 | 0.00 | 0.00 | 0.00 | 50.00 | Phase I |
| R156 | Maryard Fork | BB5-0262 | BB5-0041 | Martin | Pilgrim | | | $779,600 | $0 | $779,600 | $0 | | 400.00 | 0.00 | 0.00 | 0.00 | 400.00 | Phase I |
| R157 | 17 West | BB5-0263 | BB5-0117 | Martin | Pilgrim | | | $869,700 | $0 | $869,700 | $0 | | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | Phase I |
| R147 | Laurel Fork | BB5-0264 | BB5-0197 | Martin | Mile | 37-54-56 | 82-35-00 | $226,700 | $0 | $226,700 | $0 | | 100.00 | 0.00 | 0.00 | 0.00 | 100.00 | Phase I |
| R73 | Aldridge Branch | BB5-5382 | BB0-9044 | Martin | Moore | 37-42-57 | 82-30-21 | $461,100 | $0 | $461,100 | $0 | | 293.74 | 0.00 | 0.00 | 0.00 | 293.74 | Phase I |
| R74 | White Cabin O'Pegasus | BB5-5559 | BB0-5071 | Martin | Moore | 37-43-52 | 82-31-48 | $841,400 | $0 | $841,400 | $0 | | 60.00 | 0.00 | 0.00 | 0.00 | 31.00 | To Be Reclaimed with Aldrige Branch |
| R2 | Shop Br/Pey 2 | BS64-0455 | BS6-0313 | Floyd | Stanville | 37-35-05 | 82-56-04 | $532,000 | $0 | $532,000 | $0 | | 579.50 | 0.00 | 0.00 | 0.00 | 579.50 | Phase II |
| S9 | Tinley Br | BB84-0249 | BB5-0246 | Martin | McClure | 37-42-03 | 82-31-11 | $479,350 | $479,350 | $0 | $0 | | 311.28 | 0.00 | 0.00 | 0.00 | 311.28 | Phase I |
| R7 | Storm Impound | BB84-0259 | BB0-0155 | Martin | Pilgrim | 37-44-35 | 82-28-39 | $315,800 | $0 | $315,800 | $0 | | 157.40 | 0.00 | 0.00 | 0.00 | 157.40 | Phase I |
| R8 | H. Peter Cave | BB84-0240 | BB0-0166 | Martin | Pilgrim | 37-45-05 | 82-28-21 | $51,000 | $0 | $51,000 | $0 | | 192.40 | 0.00 | 0.00 | 0.00 | 192.40 | Phase I |
| R33 | Hog Fresh | BB6-0060 | BS0-6931 | Pike | Pen | 37-37-55 | 82-28-51 | $1,037,800 | $247,100 | $290,200 | $0 | | 520.00 | 0.00 | 0.00 | 0.00 | 500.00 | Portion Phase II |
| R24 | Scott Branch | BS6-0763 | BS6-0763 | Pike | Pen | 37-35-57 | 82-29-08 | $170,900 | $0 | $170,900 | $0 | | 300.00 | 0.00 | 0.00 | 0.00 | 300.00 | Phase I |
| R25 | Alley Branch | BS6-0766 | BS6-0764 | Pike | Meta | 37-35-49 | 82-29-40 | $462,400 | $0 | $462,400 | $0 | | 275.00 | 0.00 | 0.00 | 0.00 | 270.00 | Phase I |
| R26 | Rattlesnake | BS6-0931 | BS0-0044 | Pike | Thomas | 37-40-44 | 82-32-01 | $34,800 | $0 | $34,800 | $0 | | 25.15 | 0.00 | 0.00 | 0.00 | 25.15 | Ready for Phase I |
| S20 | 526 Below Branch | BS6-0988 | BS6-0778 | Pike | McCombs | 37-39-59 | 82-35-48 | $247,500 | $0 | $247,500 | $0 | | 200.75 | 0.00 | 0.00 | 0.00 | 200.75 | Phase I |
| | | | | | | | | **$54,482,135.00** | **33,016,389.00** | **33,016,389.00** | **5,500,000.00** | **$17,500.00** | **13,766.16** | **875.37** | **54,570.00** | **26,731.06** | **11,679.06** | |
| **New Permits (Undisturbed)** | | | | | | | | | | | | | | | | | | |
| A23 | Big Branch F-East | BS6-0992 | BS6-0792 | Pike | Stopover | 37-31-09 | 82-05-43 | 375,000 | $0 | 375,000 | $0 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Not Disturbed |
| A20 | Rockhouse Ft | BS6-0876 | --- | Pike | Marthouse | 37-33-04 | 82-18-29 | 281,500 | $244,000 | $37,500 | $0 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | Not Disturbed |

Schedule 2.1(d)

Equipment

All improvements, furniture, fixtures, equipment, machinery, tools, vehicles, and office equipment located at the (i) Pontiki Mine, (ii) Pontiki Prep Plant and (iii) Sunny Ridge Loadout Facility (aka Phelp's Loadout Facility).

## Schedule 2.1(e)

### Contracts

NONE

## Schedule 2.1(f)

### Other Purchased Assets

All inventory, supplies and any other tangible personal property located at the (i) Pontiki Mine, (ii) Pontiki Prep Plant and (iii) Sunny Ridge Loadout Facility (aka Phelp's Loadout Facility).

Schedule 3.2(d)

Litigation

NONE

## Schedule 3.2(e)

### Environmental Actions

NONE