## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Blackjewel, L.L.C., *et al*. | ) | Case No. 19-30289 |
| | ) | |
| Debtors[1], | ) | (Jointly Administered) |
| | ) | |
| BLACKJEWEL, L.L.C. and | ) | |
| REVELATION ENERGY, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Proceeding No. 3:20-ap-03012 |
| | ) | |
| v. | ) | |
| | ) | |
| LEXINGTON COAL COMPANY, LLC | ) | |
| and JEFFERY A. HOOPS, SR., | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED ADVERSARY COMPLAINT

Revelation Energy, LLC and Blackjewel, L.L.C., as plaintiffs in the above-captioned adversary proceeding ("Plaintiffs"), for their amended adversary complaint ("Amended Complaint") against Lexington Coal Company, LLC ("LCC") and Jeffery A. Hoops, Sr. ("Hoops") state and aver as follows:

### Nature of the Case

1.    This adversary proceeding seeks to recover damages from Defendants for injuries sustained by the Plaintiffs that were proximately caused by LCC's and Hoops' improper actions in using and profiting from Plaintiffs' assets, including mining permits, inventory, and equipment,

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The headquarters for each of the Debtors is located at P.O. Box 1010, Scott Depot, West Virginia 25560.

without providing adequate consideration in return.  In addition, despite owing fiduciary duties to Plaintiffs, Hoops repeatedly caused Plaintiffs to enter into financial transactions with LCC that were not reasonable or fair to Plaintiffs and stripped Plaintiffs of tens of millions of dollars in assets without receiving adequate consideration in return.  Upon information and belief, Hoops did so to further his personal financial interests and the interests of individuals and entities associated with him to the significant financial detriment of the Plaintiffs and their creditors.  This action also seeks recovery for fraudulent transfers made to and for the benefit of LCC pursuant to Sections 548 and 550 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* and applicable state law.

## **Jurisdiction and Venue**

2.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Plaintiffs consent to entry of final judgment in the Bankruptcy Court.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## **Parties**

3.     Blackjewel, L.L.C. ("Blackjewel") and Revelation Energy, LLC ("Revelation") are debtors and debtors-in-possession in the above-captioned chapter 11 cases.  Blackjewel, Revelation, and certain other debtors filed voluntary chapter 11 petitions in this Court on July 1, 2019 (the "Petition Date").

4.     Hoops is the former President and Chief Executive Officer of Blackjewel and Revelation.

5.     LCC is, on information and belief, a Delaware limited liability company with its principal office located at 164 Main Street, Suite 401, Pikeville, Kentucky 41501.  On information and belief, LCC is owned (through various holdings companies) by a trust affiliated with Hoops

and members of his family.  On information and belief, Hoops' spouse is the trustee of that trust.

## Allegations Common to All Claims

**Pattern of Unfair Transactions with LCC**

6.     Hoops engaged in a pattern and practice of causing Plaintiffs to engage in transactions with LCC that were unreasonable and unfair to Plaintiffs and that disproportionately benefitted LCC.  Hoops preferred the interests of LCC to the interests of Plaintiffs because it served his personal financial interests and the interests of family members and other associated entities to do so.

7.     For example, in September 2017, Hoops arranged for Revelation and LCC to enter into a Lease Agreement pursuant to which LCC agreed to lease four highwall miners (the "HWMs") from Revelation.

8.     Pursuant to the HWMs Lease Agreement, LCC agreed to make certain lease payments on the HWMs on Revelation's behalf.  The sum of the payments to be made by LCC under the Lease Agreement was $5,159,055.16.  Title to the HWMs was to remain with Revelation but the Lease Agreement gave LCC the option to purchase the HWMs – worth millions of dollars – for $1.00 before the end of the term of the lease.

9.     Based on the Debtors' review of their available business records, it is unclear whether the written Lease Agreement was ever executed or whether the payments called for by the Lease Agreement were ever made by LCC.  But LCC obtained, used, and kept the HWMs without paying adequate consideration to Plaintiffs.

10.     In describing the HWMs transaction to a representative of LCC, Hoops wrote on October 26, 2017 that "I acquired 4 Superior Highwall Miners from Blackjewel for less than $6mm."     In the same communication, Hoops admitted that Plaintiffs "paid $28mm for [the

HWMs] and [they] are probably worth $12-$16mm in the open market, **so trust me I am doing the right thing for LCC** . . . " (emphasis added).

11.      Hoops structured the HWMs Lease Agreement in such a manner as to ensure that millions of dollars in valuable assets were transferred from Plaintiffs to LCC without Plaintiffs receiving adequate compensation in return.

12.      In 2017 and beyond, Hoops caused Plaintiffs to engage in other transactions with LCC, including transfers of assets and equipment by Plaintiffs to LCC.  Those transactions were on terms that disproportionately benefitted LCC to the detriment of Plaintiffs.  The transactions were unfair to Plaintiffs.

13.      Hoops admitted that he acted to prefer his interests and those of LCC over the interests of Plaintiffs.  In discussing a transaction where LCC would receive mining rights and access, as well as a promised payment of $20 million to LCC in exchange for assuming certain reclamation obligations, Hoops made clear that the transaction disproportionately benefitted LCC. Hoops wrote to LCC in October 2017 stating that "Keep in mind I own 90% of LCC and only 37.5% of Blackjewel, **so I am not going to do anything that is not better for LCC than Blackjewel**" (emphasis added).  Regarding the reclamation obligations to be assumed by LCC, Hoops wrote "Yes, there are some reclamation liabilities coming with these, but they are very low cost operations **and the $20mm will cover this cost several times over**" (emphasis added).

14.      Hoops' actions breached fiduciary and other duties he owed to Plaintiffs.  The transactions between Plaintiffs and LCC were self-dealing transactions that were not adequately disclosed to or approved by Plaintiffs.

**The November 30, 2017 Asset Purchase and Permit Transfer Agreements.**

15.     Hoops arranged for Blackjewel, and Revelation to enter into a certain Asset Purchase Agreement stated to be effective as of November 30, 2017 with LCC as the buyer and Plaintiffs as sellers (the "APA").  A true and accurate copy of the APA is attached hereto as Exhibit A and incorporated herein by reference.

16.     The APA was executed on March 31, 2018 but its terms stated that it was effective retroactively to November 30, 2017.

17.     In connection with the APA, LCC and Plaintiffs also entered into a related Permit Transfer Agreement in March of 2018, which also was stated to be effective retroactive to November 30, 2017 (the "Permit Transfer Agreement").  A true and accurate copy of the Permit Transfer Agreement is attached hereto as Exhibit B and incorporated herein by reference.

18.     In late 2017 and throughout early 2018, Revelation, Blackjewel, and LCC had communications regarding the terms of the APA and the Permit Transfer Agreement and the transfer by Blackjewel and Revelation of certain leased real property, mining permits, equipment, and inventory, and other significant assets to LCC.

19.     Upon information and belief, the final terms of the APA and the Permit Transfer Agreement were dictated by Hoops, including the identification of the assets to be transferred to LCC.  Blackjewel and Revelation had no independent representation regarding the APA and Permit Transfer Agreement, the assets to be transferred to LCC, or the other terms of the contracts. Upon information and belief, the APA and the Permit Transfer Agreement were prepared by legal counsel retained by Hoops to represent Plaintiffs, but who also served as legal counsel to Hoops personally and to numerous of Hoops' other businesses and ventures, including LCC.  Hoops directed such legal counsel regarding the terms of the APA and Permit Transfer Agreement.

20.     Pursuant to the terms of the APA, the assets transferred by Blackjewel and Revelation to LCC included numerous leases and other real property interests identified in Schedule 2.1(b) to the APA (the "Leased Property").

21.     Pursuant to the terms of the APA and Permit Transfer Agreement, Blackjewel and Revelation transferred to LCC their interests in more than sixty mining permits identified on Schedule 2.1(c) of the APA (the "Permits").

22.     Pursuant to the terms of the APA and Permit Transfer Agreement, Blackjewel and Revelation transferred valuable inventory and equipment to LCC.

23.     Section 2.1(d) of the APA states that the equipment transferred by Revelation and Blackjewel was to be "listed on Schedule 2.1(d)."  Schedule 2.1(d) of the APA does not list the transferred equipment but rather states that it includes "[a]ll improvements, furniture, fixtures, equipment, machinery, tools vehicles, and office equipment located at the (i) Pontiki Mine, (ii) Pontiki Prep Plant and (iii) Sunny Ridge Loadout Facility (aka Phelp's Loadout Facility)."

24.     Section 2.1(f) of the APA provides that Blackjewel and Revelation were to transfer to LCC "Other Purchased Assets" that consisted of assets to be listed on Schedule 2.1(f) to the APA and "all other assets which are directly related" to the other categories of assets transferred under the APA.  Schedule 2.1(f) of the APA does not list transferred assets but rather states that it includes "[a]ll inventory, supplies and any other tangible personal property located at the (i) Pontiki Mine, (ii) Pontiki Prep Plan and (iii) Sunny Ridge Loadout Facility (aka Phelp's Loadout Facility)."

25.     On information and belief, Blackjewel and Revelation transferred millions of dollars of machinery, equipment, and other assets to LCC pursuant to the APA.  These assets were

transferred to LCC without a valuation and without proper recordkeeping or documentation for the transfers.

26.     From the effective date of the APA and Permit Transfer Agreements, LCC has made beneficial use of the transferred assets, including use of the Leased Property, the Permits, equipment, and other assets.  LCC has conducted mining operations on the Leased Property and has removed and sold coal obtained from those mining operations.  On information and belief, LCC has sold over $25 million in coal mined from the Leased Property and the location of the Permits.

27.     Under the APA, LCC was obligated to assume and perform certain "Assumed Obligations" identified in Section 2.2, including reclamation obligations and environmental obligations "relating to the Purchased Assets arising at any time after the Closing Date."

28.     In the more than two years since the closing of the APA in March of 2018, LCC has failed to transfer all of the Permits as required by the terms of the APA and the Permit Transfer Agreement.   In particular, LCC has failed to transfer Permits with substantial reclamation obligations while pursuing transfer of Permits that it deemed more desirable.  On information and belief, LCC sold two of the transferred Permits to a third party.  LCC has not fully or materially performed the Assumed Obligations under the terms of the APA.

29.     The terms of the APA and Permit Transfer Agreement were unfair to Blackjewel and Revelation.  The terms of the APA and Permit Transfer Agreement were never approved by a fully or adequately informed director or officer of Blackjewel or Revelation without an interest in the transactions.   Communications by Hoops regarding the transactions were inaccurate and incomplete.

30.     Neither Blackjewel nor Revelation received reasonably equivalent value for the assets transferred to LCC pursuant to the APA.

31.     LCC used the assets transferred by Blackjewel and Revelation without providing any value because LCC did not perform its own obligations under the APA.

**Equipment Possessed by LCC**

32.     Hoops encouraged and allowed LCC's use of mining equipment belonging to Plaintiffs.

33.     At various times during the bankruptcy cases, Debtors have demanded that LCC return equipment owned by the Debtors.  LCC has failed to respond to those demands and has failed to turnover property of the Debtors.  The Debtors' ongoing investigation has demonstrated that LCC is in possession of property of the Debtors that it has failed to account for or return.

34.     In July of 2019 following the filing of Debtors' bankruptcy cases, communications between Hoops, LCC, and others indicates that LCC possessed at least 28 pieces of equipment belonging to Plaintiffs.

35.     LCC is obligated to return and turnover this equipment to the Debtors' estates.  LCC failed to turnover the equipment in response to repeated demands by the Debtors.

**COUNT ONE**
**(Breach of Contract – Against LCC)**

36.     Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-35 of the Complaint.

37.     The APA and Permit Transfer Agreement establish legal obligations that are enforceable by Plaintiffs.  All conditions to LCC's obligations under the APA and Permit Transfer Agreement were performed or have occurred.

38.     LCC breached its obligations under the APA.  LCC breached its obligations under the Permit Transfer Agreement.

39.     LCC breached the APA by failing to perform the Assumed Obligations under the APA.

40.     LCC breached Section 5.3(a) of the APA, including by failing to use "commercially reasonable efforts to diligently and in good faith pursue the transfer of each Permit" and to obtain "the approval of each such transfer by each relevant Governmental Authority."  LCC breached Section 5.3(b) of the APA, including through its operations on the properties corresponding to the Permits following closing of the APA.

41.     LCC breached Section 5.1 of the APA by failing to take all further actions necessary to "carry out the purposes" of the APA, which includes the transfer of the Permits.

42.     LCC breached Section 5.3(e) of the APA by failing to reimburse Plaintiffs for their continuing costs, including keeping bonds in full force and effect.

43.     LCC breached Section 4.1 of the APA by falsely representing and warranting that it had the power and ability to perform its obligations under the APA.

44.     LCC breached Section 7(a) of the Permit Transfer Agreement by failing to "promptly apply for and diligently pursue all applications for and [to] us commercially reasonable efforts to promptly obtain such consents, authorizations and approvals from such governmental authorities and third parties as shall be necessary or appropriate to permit the consummation of the transactions contemplated" by the Permit Transfer Agreement.

45.     LCC breached the implied covenant of good faith and fair dealing under both the APA and the Permit Transfer Agreement, including by using the transferred assets without employing good faith efforts to assume and perform corresponding obligations.

46.     These and other breaches of the APA and the Permit Transfer Agreement by LCC were material.

47.     Plaintiffs have been damaged as the proximate result of LCC's breaches of the APA and Permit Transfer Agreement.  Plaintiffs are entitled to recover damages from LCC for LCC's breaches of the APA and Permit Transfer Agreement in an amount to be proven at trial.

## COUNT TWO
### (Unjust Enrichment – Against LCC)

48.     Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-47 of the Complaint.

49.     LCC has been unjustly enriched by its improper conduct concerning Plaintiffs. Among other things, LCC has been unjustly enriched by receiving and using the benefit of millions of dollars of assets from Plaintiffs without providing compensation.

50.     LCC also has been unjustly enriched by conducting mining operations on Leased Property provided by Plaintiffs and from profits from the sale of coal from such operations.  LCC also has been unjustly enriched by conducting mining operations on the Leased Property that created the need for additional reclamation work without performing such work or compensating Plaintiffs for the incremental obligation.

51.     Separate from and in addition to the other items of unjust enrichment alleged above, LCC has, on information and belief, been unjustly enriched by receiving a transfer of $718,559 from Blackjewel on or around June 10, 2019.  Debtors' financial records reflect the payment of this amount to LCC in the month preceding the Debtors' bankruptcy filing but do not reflect any obligation owed by Blackjewel corresponding to the payment or any justification for the payment. LCC has been unjustly enriched by the amount of the payment.

52.     LCC has also been unjustly enriched by its receipt of the HWMs, for which Plaintiffs paid more than $28 million.  LCC purportedly assumed less than $6 million of obligations in consideration for the transfer of the HWMs despite the fact that Hoops and LCC knew that they worth at least $12-$16 million in the open market at the time.

53.     LCC has also been unjustly enriched by the use of the HWMs and other equipment of Plaintiffs without compensation.  The use of the HWMs and other equipment without compensation to Plaintiffs, with the corresponding depreciation and impact to their conditions, represents an additional unjust benefit to and enrichment of LCC.

54.     LCC's unjust enrichment was to the detriment of Plaintiffs.

55.     LCC is aware of the unjust enrichment and did not compensate Plaintiffs for its unjust enrichment.  It would be inequitable to allow LCC to retain the benefit of the unjust enrichment to the detriment of Plaintiffs.

56.     Plaintiffs have been damaged by the unjust enrichment of LCC to the detriment of Plaintiffs.  LCC should be required to compensate Plaintiffs for its unjust enrichment.  Principles of equity dictate that LCC compensate Plaintiffs and make them whole for LCC's unjust enrichment.

**COUNT THREE**
**(Breach of Fiduciary Duty – Against Hoops as to Transactions and Dealings with LCC)**

57.     Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-56 of the Complaint.

58.     Hoops owed fiduciary duties to Plaintiffs, including duties of care and loyalty. Consistent with these duties, Hoops was obligated to act in a disinterested, good faith, and independent manner to serve the best interests of Plaintiffs.  Hoops' duty of care to Plaintiffs

required, among other things, Hoops to ensure that transactions involving Plaintiffs were fair to them and served their interests.

59.    Hoops also had a duty of good faith and was required to exercise good faith in all of his dealings with and on behalf of the Plaintiffs, including with respect to any transactions between Plaintiffs and LCC.

60.    Hoops breached his fiduciary duties and duty of good faith to Plaintiffs in connection with the dealings between Plaintiffs and LCC, including but not limited to, regarding the APA, the HWMs Lease, LCC's use of Plaintiffs' equipment, and other transactions.  Hoops breached his fiduciary duties by causing Plaintiffs to enter into transactions and engage in dealings with LCC where the terms of those transactions and dealings were unfair to Plaintiffs.  Hoops breached his duty of loyalty by causing Plaintiffs to engage in transactions in which Hoops had financial and other personal interests.  Hoops also breached his duties by failing to make proper or complete disclosures regarding self-dealing transactions with LCC and by acting in a self-interested fashion.

61.    Hoops has admitted that he preferred LCC's interests over the interests of Plaintiffs, including with respect to the HWMs, mining and permit-related transactions, and generally that he would ensure that dealings were "better for LCC than Blackjewel" because of his financial interest in LCC.  These admissions establish the breach of this duties to Plaintiffs.

62.    Hoops' breaches were motivated by his personal financial interests, including his desire to move assets beyond the reach of creditors, and was an intentional, willful, and wanton disregard of his fiduciary duties to Plaintiffs.  Hoops conduct was undertaken maliciously for the purpose of injuring Plaintiffs by stripping them of valuable assets in order to enrich LCC for the benefit of himself and his family members.

63.     As a direct and proximate result of Hoops' breaches of his fiduciary duties and duty of good faith, Plaintiffs have been damaged in an amount to be proven at trial, including the fair market value of the assets that were improperly transferred. In addition, because Hoops' conduct was malicious, intentional, willful and wanton, Plaintiffs are entitled to and demand an award of punitive damages against him.

### COUNT FOUR
### (Aiding and Abetting Breach of Fiduciary Duty – Against LCC)

64.     Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-63 of the Complaint.

65.     LCC aided and abetted Hoops in breaching his fiduciary duties to Plaintiffs, including by facilitating Hoops' efforts to strip Plaintiffs of their valuable assets and transfer them to LCC.  LCC further aided and abetted Hoops in breaching fiduciary duties to Plaintiffs by failing to perform obligations or provide the ostensible consideration for LCC's receipt of the assets from Plaintiffs.

66.     LCC knew Hoops' owed fiduciary obligations to Plaintiffs.

67.     LCC knew that Hoops' was breaching fiduciary duties to Plaintiffs by causing them to enter into transactions that were unfair to Plaintiffs.  LCC knew that Hoops was breaching fiduciary duties to Plaintiffs by Hoops causing Plaintiffs to transfer assets to LCC for far below market value.  LCC also knew that Hoops was breaching fiduciary duties to Plaintiffs because Hoops told officers of LCC in writing that he was preferring LCC's interests over Plaintiffs because of Hoops' own economic interests in LCC.

68.     LCC provided substantial assistance to Hoops' breaches of fiduciary duty by participating in and continuing the unfair dealings with Plaintiffs and by taking and using Plaintiffs' assets without prior compensation.

69.     Plaintiffs have been injured by LCC's actions.  LCC's actions have proximately caused damages to Plaintiffs in an amount to be proven at trial.  Because LCC acted with gross fraud, malice, and oppression, and through willful, wanton, and reckless conduct in aiding and abetting Hoops' breaches of fiduciary duties, Plaintiffs are entitled to an award of punitive damages against LCC.

## COUNT FIVE
### (to Avoid Constructively Fraudulent Transfers Under 11 U.S.C. § 548 – Against LCC)

70.     Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-69 of the Complaint.

71.     Each transfer of a valuable asset by Plaintiffs to LCC under the APA and/or the Permit Transfer Agreement, the HWMs Lease Agreement, the transfer of $718,559 from Blackjewel to LCC on or around June 10, 2019, payments or transfers for reclamation obligations that LCC did not perform, and LCC's taking of Plaintiffs' equipment without compensation (each a "Transfer") was a transfer of an interest of the Plaintiffs in property.

72.     The Plaintiffs did not receive reasonably equivalent value for any of the Transfers. LCC did not provide adequate consideration or fair market value for any of the Transfers.

73.     At the time of each Transfer, the Plaintiffs were:  (a) insolvent, or rendered insolvent as the result of the Transfer; (b) engaged in business or a transaction, or were about to engage in business or a transaction, for which the Plaintiffs' remaining property was an unreasonably small capital; and/or (c) the Plaintiffs intended to incur, or believed or reasonably should have believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

74.     Each Transfer should be avoided as a constructively fraudulent transfer.  The Plaintiffs are entitled to, and the Court should enter, judgment against LCC avoiding each Transfer

received by LCC pursuant to section 548 of the Bankruptcy Code and/or providing other relief the circumstances may require.

75.     Each Transfer can and should be avoided as to LCC and as to any subsequent transferee.

**COUNT SIX**
**(to Avoid Constructively Fraudulent Transfers Under 11 U.S.C. § 544 and**
**the West Virginia Uniform Fraudulent Transfers Act – Against LCC)**

76.     Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-75 of the Complaint.

77.     Each Transfer also can and should be avoided pursuant to section 544 of the Bankruptcy Code and applicable state law.  Pursuant to section 544(b) of the Bankruptcy Code, the Plaintiffs (as debtors-in-possession) have the rights of existing unsecured creditors.  Section 544(b) permits the Plaintiffs to assert claims and causes of action that such a creditor could assert under applicable state law.

78.     Each of the Transfers can and should be avoided pursuant to West Virginia law. Plaintiffs did not receive reasonably equivalent value for any of the Transfers.  LCC did not provide adequate consideration or fair market value for any of the Transfers.

79.     At the time of each Transfer, the Plaintiffs were insolvent, or rendered insolvent as the result of the Transfer within the meaning of West Virginia Code § 40-1A-5(a).

80.     At the time of each Transfer, the Plaintiffs were engaged or were about to engage in a business or a transaction for which the remaining assets of the Plaintiffs were unreasonably small in relation to the business or transaction within the meaning of West Virginia Code § 40-1A-4(a)(2)(i).  At the time of each Transfer, the Plaintiffs intended to incur, or believed or

reasonably should have believed that they would incur, debts beyond their ability to pay as they became due within the meaning of West Virginia Code § 40-1A-4(a)(2)(ii).

81.    The Plaintiffs are entitled to, and the Court should enter, judgment against LCC avoiding each Transfer received by LCC pursuant to section 544 of the Bankruptcy Code and applicable West Virginia law and/or providing other relief the circumstances may require.

82.    Each Transfer can and should be avoided as to LCC and as to any subsequent transferee.

## COUNT SEVEN
### (To Recover Avoided Transfers Under 11 U.S.C. § 550 – Against LCC)

83.    Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-82 of the Complaint.

84.    LCC was the initial transferee of the Transfers.

85.    To the extent that the Transfers are avoided pursuant to sections 544 and 548 of the Bankruptcy Code, as requested herein, the Plaintiffs are entitled to recover, for the benefit of their estates and creditors, the value of the avoided Transfers from LCC, pursuant to section 550 of the Bankruptcy Code.

86.    Accordingly, the Plaintiffs are entitled to judgment against LCC, and any subsequent transferee of LCC, in an amount not less than the value of the avoided Transfers, plus pre- and post-judgment interest, attorneys' fees and costs pursuant to section 550 of the Bankruptcy Code.

## COUNT EIGHT
### (for Declaratory Relief Regarding Preservation of Avoided Transfers and Disallowance of Claims by LCC)

87.    Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-86 of the Complaint.

88.    Pursuant to section 551 of the Bankruptcy Code, any transfer avoided under sections 544 or 548, among other things, is automatically preserved for the benefit of the debtor's estate with respect to property of the estate.  Pursuant to section 541(a)(4) of the Bankruptcy Code, any property preserved for the benefit of the debtor's estate under section 551 of the Bankruptcy Code constitutes property of the debtor's estate.

89.    Pursuant to section 502(d) of the Bankruptcy Code, any claim by an entity that is a transferee of a transfer avoidable under sections 544 or 548 is disallowed unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable.

90.    The Court can and should order and enter a declaratory judgment that the Transfers are automatically preserved for the benefit of the Plaintiffs' estates and constitute property of the Plaintiffs' estates, pursuant to sections 541(a)(4) and 551 of the Bankruptcy Code.  The Court can and should order and enter a declaratory judgment that all claims by LCC against the Plaintiffs or any Debtors are disallowed unless and until LCC has paid the amount of the Transfers to the Plaintiffs.

**COUNT NINE**
**(for Turnover of Property under 11 U.S.C. § 542 and § 362 – Against LCC)**

91.    Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-90 of the Complaint.

92.    LCC has and had actual knowledge of Plaintiffs' filing of chapter 11 cases and their operation as debtors-in-possession.

93.    During Plaintiffs' chapter 11 cases, LCC is and has been in possession, custody, and control of equipment belonging to Plaintiffs.  The equipment is property of Plaintiffs that LCC is obligated to deliver to Plaintiffs and account for pursuant to 11 U.S.C. § 542(a).

94.     LCC failed to return the equipment upon demand by Plaintiffs.

95.     LCC continues to exercise improper dominion and control over the equipment

despite Plaintiffs' demand on the LCC to account for and return the equipment.  LCC's continuing

exercise of control over the equipment is an ongoing violation of the automatic stay pursuant to 11

U.S.C. § 362(a).

96.     The return of the equipment is of consequential value and benefit to Plaintiffs'

estates.

## COUNT TEN
## (for Equitable Subordination of any Claims by LCC)

96.     Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the

allegations contained in the foregoing paragraphs 1-95 of the Complaint.

97.     LCC has engaged in a pattern of improper and inequitable conduct concerning

Plaintiffs.  LCC used its relationship with Hoops to obtain assets and payments to the detriment of

Plaintiffs and the other Debtors, their creditors and their bankruptcy estates and to shift obligations

on Plaintiffs' to their detriment and LCC's improper benefit.  LCC stripped assets from Plaintiff

without providing value to Plaintiffs and on terms that were unreasonable and bore no relation to

arms'-length dealing.

98.     Plaintiffs' and the other Debtors' creditors were directly and substantially harmed

by LCC's conduct.  Unsecured creditors of Plaintiffs and the other Debtors are less likely to

recover the full amounts due them because of LCC's inequitable conduct.

99.     Under principles of equitable subordination, all claims that have been or may be

asserted by LCC against Plaintiffs and the other Debtors, including proofs of claim and claimed

rights of setoff or recoupment, should be subordinated for purposes of distribution, pursuant to

sections 510(c) and 105(a) of the Bankruptcy Code, such that LCC's claims are not paid or

recognized for value ahead of any other creditor.

100.    Equitable subordination of LCC's claims is consistent with the purposes and provisions of the Bankruptcy Code.

101.    For the reasons alleged in this Count Ten, to the extent that LCC is determined to have a lien on property of Plaintiffs' estates, the Court should enter an order transferring such lien to Plaintiffs, pursuant to sections 510(c)(2) and 105(a) of the Bankruptcy Code.

## COUNT ELEVEN
### (for Equitable Subordination of Claims by Hoops)

102.    Plaintiffs re-allege and incorporate by reference, as if fully rewritten herein, the allegations contained in the foregoing paragraphs 1-101 of the Complaint.

103.    Hoops has engaged in a pattern of improper and inequitable conduct concerning Plaintiffs in violation of his fiduciary duties.  Hoops used his ownership and control of Plaintiffs to obtain and transfer assets and payments from Plaintiffs to LCC to the detriment of Plaintiffs and the other Debtors, their creditors and their bankruptcy estates and to shift obligations on Plaintiffs to their detriment and LCC's and Hoops' improper benefit.  Hoops stripped assets from Plaintiffs without providing value to Plaintiffs and on terms that were unreasonable and bore no relation to arms'-length dealing between LCC and Plaintiffs.

104.    Hoops admitted in writing that he was preferring LCC to the interests of Plaintiffs because of his financial interest in LCC.

105.    Plaintiffs' and the Debtors' creditors were directly and substantially harmed by Hoops' conduct.  Unsecured creditors of Plaintiffs and the other Debtors are less likely to recover the full amounts due them because of Hoops' inequitable conduct.

106.    Under principles of equitable subordination, all claims that have been or may be

asserted by Hoops against Plaintiffs, including proofs of claim and claimed rights of setoff or recoupment, should be subordinated for purposes of distribution, pursuant to sections 510(c) and 105(a) of the Bankruptcy Code, such that Hoops' claims are not paid or recognized for value ahead of any other creditor.

107.    Equitable subordination of Hoops' claims is consistent with the purposes and provisions of the Bankruptcy Code.

108.    For the reasons alleged in this Count Eleven, to the extent that Hoops is determined to have a lien on property of Plaintiffs' estates, the Court should enter an order transferring such lien to Plaintiffs, pursuant to sections 510(c)(2) and 105(a) of the Bankruptcy Code.

WHEREFORE, Plaintiffs demand judgment against LCC and Hoops as follows:

(a)    On Count One, that the Court award Plaintiffs a money judgment against LCC in an amount to be determined at trial;

(b)    On Count Two, that the Court enter an order requiring LCC to pay to Plaintiffs an amount of money sufficient to remedy LCC's unjust enrichment;

(c)    On Count Three, that the Court award Plaintiffs a money judgment against Hoops in an amount to be determined at trial, including punitive damages, plus costs and attorneys' fees;

(d)    On Count Four, that the Court award Plaintiffs a money judgment against LCC in an amount to be determined at trial, including punitive damages, plus costs and attorneys' fees;

(e)    On Counts Five and Six, that the Court enter an order avoiding each of the Transfers to LCC under sections 544 and 548 of the Bankruptcy Code and applicable West Virginia law and/or providing other relief the circumstances may require;

(f)    On Count Seven, that the Court enter an order requiring LCC to pay or otherwise turn over to Plaintiffs the Transfers, or in the alternative, grant a money judgment against LCC in an amount not less than the total value of the Transfers, together with pre- and post-judgment interest at the maximum legal rate under 28 U.S.C. § 1961 from the earliest date allowed by law until the date of judgment or until paid or turned over in full, as applicable;

(g)     On Count Eight, that the Court enter a judgment declaring that the Transfers to LCC are preserved for the benefit of the Plaintiffs' estates and that all claims against the Plaintiffs and the Debtors by LC are disallowed unless and until LCC has turned over the Transfers to Plaintiffs or paid Plaintiffs the value of the Transfers;

(h)     On Count Nine, that the Court enter an order requiring LCC to turnover and account for all property of Plaintiffs' estates in LCC's possession, custody, or control, including the equipment, and to award Plaintiffs all other available relief pursuant to 11 U.S.C. § 542 and 11 U.S.C. § 362;

(i)     On Count Ten, that the Court enter an order subordinating all claims that have been or may be asserted by LCC against Plaintiffs, including proofs of claim and claimed rights of setoff or recoupment, pursuant to sections 510(c) and 105(a) of the Bankruptcy Code, such that LCC's claims are not paid or recognized for value ahead of any other creditor, and an order directing that LCC transfer to Plaintiffs any liens securing the subordinated claims; and

(j)     On Count Eleven, that the Court enter an order subordinating all claims that have been or may be asserted by Hoops against Plaintiffs, including proofs of claim and claimed rights of setoff or recoupment, pursuant to sections 510(c) and 105(a) of the Bankruptcy Code, such that Hoops' claims are not paid or recognized for value ahead of any other creditor, and an order directing that Hoops transfer to Plaintiffs any liens securing the subordinated claims;

(k)     Awarding the Plaintiffs attorneys' fees and costs; and

(l)     Granting any other and further relief that this Court deems just and equitable.

Dated: January 21, 2021                    Respectfully submitted,


                                           **SUPPLE LAW OFFICE, PLLC**

                                           Joe M. Supple No. 8013
                                           801 Viand St.
                                           Point Pleasant, WV 25550
                                           304-675-6249
                                           joe.supple@supplelaw.net

                                           – and –

                                           **SQUIRE PATTON BOGGS (US) LLP**

                                           */s/ Scott A. Kane*
                                           Stephen D. Lerner (admitted *pro hac vice*)
                                           Scott A. Kane (admitted *pro hac vice*)
                                           F. Maximilian Czernin (admitted *pro hac vice*)
                                           Travis A. McRoberts (admitted *pro hac vice*)
                                           201 E. Fourth Street, Suite 1900
                                           Cincinnati, Ohio 45202
                                           Telephone: 513.361.1200
                                           Facsimile: 513.361.1201
                                           stephen.lerner@squirepb.com
                                           scott.kane@squirepb.com
                                           nava.hazan@squirepb.com
                                           max.czernin@squirepb.com
                                           travis.mcroberts@squirepb.com

                                           *Co-Counsel for the Debtors and*
                                           *Debtors-in-Possession*